The BUDD COMPANY RAILWAY
DIVISION, Plaintiff,

v.

The UNITED STATES, Defendant,

Nissho-Iwai American Corporation and
Kawasaki Heavy Industries, Ltd.,
Intervenors Parties-in-Interest,

and

Breda Costruzioni Ferroviarie, S.p.A.,
Intervenor Party-in-Interest.

No. 80–3–00505.

United States Court of International
Trade.

Dec. 29, 1980.

**998**

Barnes, Richardson & Colburn, New York City (Andrew P. Vance and Raymond F. Sullivan, New York City, on the briefs), for plaintiff.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Director, International Trade Field Office, Commercial Litigation Branch, New York City (Francis J. Sailer, Washington, D. C., on the brief), for the United States, defendant.

Arent, Fox, Kintner, Plotkin & Kahn (Stephen L. Gibson and Evan R. Berlack, Washington, D. C., on the briefs), for Nissho-Iwai American Corp. and Kawasaki

Heavy Industries, Ltd., intervenors parties-in-interest.

Bosco & Curry, Washington, D. C. (Joseph A. Bosco, Washington, D. C., on the briefs), Landfield, Becker & Green (William W. Becker, Washington, D. C., on the briefs), for Breda Costruzioni Ferroviarie, S.p.A., intervenor party-in-interest.

## OPINION AND ORDER

BOE, Judge:

The plaintiff, The Budd Company, Railway Division, which assembles rail passenger cars as well as manufactures certain components and parts therefor at its plant in Philadelphia, Pennsylvania, brings this action under section 516A(1)(D) of the Tariff Act of 1930 as amended by the Trade Agreements Act of 1979 contesting the preliminary determination by the United States International Trade Commission (Commission) of "No Reasonable Indication of Material Injury" in *Rail Passenger Cars and Parts Thereof Intended for Use as Original Equipment in the United States from Italy and Japan.* Investigations Nos. 731–TA–5 and 6 (Preliminary). 45 Fed. Reg. 11942–43 (published Feb. 22, 1980).[1]

The antidumping investigative proceedings instituted by the Commission pursuant to the petition filed by the plaintiff relate specifically to contracts executed between (1) the Greater Cleveland Regional Transit Authority and Breda Costruzioni Ferroviarie, S.p.A. (Breda) of Italy in 1978 for the purchase of 48 light rail vehicles; (2) the Southeastern Pennsylvania Transportation Authority and Nissho-Iwai American Corporation and Kawasaki Heavy Industries, Ltd., (Nissho-Iwai) of Japan in 1979 for the purchase of 141 light rail vehicles; (3) the

---

**1.** The Trade Agreements Act of 1979 expressly repeals the Antidumping Act of 1921 and prescribes, *inter alia*, the procedures and standards for the administrative determinations that are a prerequisite to the imposition of antidumping duties. The Act further provides for judicial review of those administrative determinations defining the scope and standard of such review. A significant departure from the old law governing antidumping duty proceed-

ings is found in the judicial review of preliminary administrative determinations as evidenced by the Commission's preliminary determination before this court in the present action.

Except as otherwise specifically cited, all references hereinafter made to the provisions of the Trade Agreements Act of 1979 shall bear the citations to the respective sections of the Tariff Act of 1930, which the former amends.

Washington Metropolitan Area Transit Authority and Breda of Italy in 1979 for the purchase of 94 rapid transit cars.

In this action the plaintiff requests that the court: (1) find the preliminary determination by the Commission that there is no reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of the importation from Italy and Japan of rail passenger cars and parts thereof intended for use as original equipment in the United States, which are allegedly sold at less than fair value, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and, therefore, unlawful under section 516A(b)(1)(A) of the Tariff Act of 1930, and (2) make an affirmative determination of a reasonable indication of material injury with respect to the products that were the subject matter of the Commission's investigation.

The administrative proceedings concerning which judicial review is herein sought may be summarized as follows:

On October 16, 1979, plaintiff submitted to the Commissioner of Customs, Department of the Treasury, a "Petition for the Imposition of Antidumping Duties on Rail Passenger Cars from Japan and Italy," pursuant to the Antidumping Act of 1921.

On November 27, 1979, an Antidumping Proceeding Notice was published in the Federal Register advising that a petition in proper form had been received and that after a summary investigation had been conducted a full-scale antidumping investigation was "being initiated for the purpose of determining whether imports of rail passenger cars and parts thereof which are intended for use as original equipment in the United States from Japan and Italy are being, or likely to be, sold at less than fair value within the meaning of the Antidumping Act of 1921, as amended." 45 Fed.Reg. 67747 (1979).

No preliminary determinations nor final determinations under the provisions of the Antidumping Act of 1921 as to the question of less than fair value sales had by January 1, 1980, been made by the Secretary of the Treasury in the antidumping cases involving rail passenger cars from Italy and Japan. Accordingly, pursuant to section 102(b) of the Trade Agreements Act of 1979, those cases were forthwith referred to the Commission for determinations of reasonable indications of injury.

On January 14, 1980, a Notice of Institution of Preliminary Antidumping Investigation and Scheduling of Conferences was published in the Federal Register advising that effective January 1, 1980, the Commission was instituting Antidumping Investigations Nos. 731–TA–5 and 6 (Preliminary), and that the Director of Operations of the Commission had scheduled a conference on January 29, 1980, at which time parties in support and in opposition to the antidumping petition would receive an opportunity to make oral presentations. Written statements of information pertinent to the subject matter of the investigations were to be submitted before February 1, 1980. 45 Fed. Reg. 2715 (1980).

On January 29, 1980, a conference was held at which time the respective parties to this action submitted testimony and exhibits. The testimony submitted was not subject to cross-examination.

On February 11, 1980, the Commission made a unanimous negative preliminary determination with respect to the subject matter under investigation, and on February 22, 1980, a notice of "Determination of 'No Reasonable Indication of Material Injury'" was published in the Federal Register. 45 Fed.Reg. 11942 (1980).

On March 24, 1980, the within action was commenced in the United States Customs Court pursuant to section 516A(a)(1)(D), Tariff Act of 1930, by the concurrent filing of a summons and complaint. The proceeding is presently before this court on a motion for summary judgment filed by the plaintiff and a cross-motion for summary judgment filed by the defendant, the Unit-

ed States, and the intervenors parties-in-interest.[2]

■ In the review of the negative preliminary determination of the Commission by this court, the scope thereof encompasses only the information before the Commission at the time the determination was made, including any information that has been compiled as a part of a formal record. S.Rep. No. 249, 96 Cong., 1st Sess. 248, U.S.Code Cong. & Admin.News 1979, p. 381.

The standard of review to be followed by this court has been clearly defined in section 516A(b)(1)(A), Tariff Act of 1930, providing:

(b) Standards of Review.—

Remedy.—The court shall hold unlawful any determination, finding, or conclusion found—

(A) in an action brought under paragraph (1) of subsection (a), to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or * * *.

Legislative history evidences the intent of Congress with respect to the criteria to be followed by the court in its evaluation of the findings of the Commission:

Section 516A would make it clear that traditional administrative law principles are to be applied in reviewing antidumping ... duty decisions where by law Congress has entrusted the decision-making authority in a specialized, complex economic situation to administrative agencies. Thus, review of any determination listed in subsection (a)(1) would be to ascertain whether there was a rational basis in fact for the determination by the administrative decision-maker. S.Rep., *supra*, at 252, U.S.Code Cong. & Admin. News 1978 at 637.

The application of this standard of review by the reviewing court has been succinctly stated by the United States Supreme Court in the case of *Bowman Transportation v. Arkansas-Best Freight Systems, Inc.*:

A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' [Citation omitted.] The agency must articulate a 'rational connection between the facts found and the choice made.' [Citation omitted.] While we may not supply a reasoned basis for the agency's action that the agency itself has not given, [Citation omitted.], we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. 419 U.S. 281, 285–6, 95 S.Ct. 438, 441–2, 42 L.Ed.2d 447 (1974).

Having recognized the narrow standard by which the court must predicate its review of the Commission's determination in the within action, it is proper that, prior to an evaluation of the specific findings as made by the Commission, we look to the function and obligation of that body in the performance of its investigative prerogatives authorized by the statute.

■ The preliminary determination by the Commission required by section 733(a) must be "based upon the best information available to it at the time of the determination." Although recognizing the restrictions placed upon an investigation by virtue of a 45-day time limitation, Congress has prescribed a thorough investigation by the Commission prior to the making of its preliminary determination.

The time limit provided in the bill for an ITC preliminary determination, although longer than that under present law, is still quite brief. It is therefore intended that the ITC will investigate the allegations in the petition in as thorough a manner as possible using the informa-

**2.** Under the Rules of this Court effective November 1, 1980, the time-consuming delay connected with the utilization of the procedure providing for motions and cross-motions for

summary judgment can be avoided, thus permitting a more expeditious review by this court in keeping with congressional intent.

tion available within that time period, and will provide interested parties a reasonable opportunity to present their views. Such opportunity does not necessarily include a hearing such as that required prior to a final determination. [Emphasis supplied.] H.R.Rep. No. 317, 96th Cong., 1st Sess. 61.

From the provisions of the Trade Agreements Act of 1979, it appears clear that Congress anticipates that the Commission take an active role in obtaining information prior to its determination.

(b) DETERMINATIONS TO BE MADE ON BEST INFORMATION AVAILABLE.—In making their determinations under [title VII of the Tariff Act of 1930], the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available. Section 776(b).

Congress also has observed that "[t]he nature of the [Commission's] inquiry may vary from case to case depending on the nature of the information available and the complexity of the issues." S.Rep., *supra*, at 66, U.S.Code Cong. & Admin.News 1979 at 452. Although an initiating petition filed with the administering authority and the Commission pursuant to section 732(a) must be accompanied by information reasonably available to the petitioner supporting the allegations in the petition, the affirmative obligation and duty of the Commission to conduct a "thorough investigation" is not relieved thereby. By explanation the House Committee has stated in its report:

The Committee has long been concerned that petition requirements not be so onerous as to preclude petitioners presenting meritorious complaints from obtaining the remedy provided by law. The Committee therefore intends that no petitioner shall be required to provide information not reasonably available to him ... The petitioner will be expected to use reasonable efforts to collect infor-

mation from public and industry sources. H.Rep., *supra*, at 60.

The information which reasonably would be available to a petitioner is governed to a great extent by the nature of the proceedings. Congress has recognized that the administrative proceedings under Title VII of the Tariff Act of 1930 are investigatory, not adjudicatory. H.R.Rep., *supra*, at 77; S.Rep., *supra*, at 100, U.S.Code Cong. & Admin.News 1979 at 486. Accordingly, no procedure has been established by statute nor by regulation promulgated thereto providing for discovery of an opposing party prior to or at the time of the investigation. In the preliminary determination proceedings of the Commission, presently under review in this court, no hearing is required to be provided. A conference may be held by the staff of the Commission at which interested parties may present their views without the opportunity for cross-examination.

The statutory provisions of the Trade Agreements Act of 1979, indeed, clearly express the congressional intent that the Commission will obtain information through its own investigative sources. Section 777 provides for access of interested parties to information both confidential and nonconfidential which has been received by the Commission in connection with its investigation. It specifically requires the Commission, upon request, to inform the parties to an investigation of the progress thereof. Section 777(a)(2). Among the reasons given for the enactment of this section, Congress has referred to the complaint of domestic industries in which they contend that their ability to obtain relief under prior laws has been impaired by their lack of access to the information presented. In light of the investigative posture of the administrative proceedings and the newly enacted judicial review procedure, the need to insure that all interested parties are fully aware of all information presented is imperative. H.R. Rep., *supra*, at 77. In this connection it is worthy of note that at this stage of the administrative proceedings, the determination of which is herein under review, it is

the Commission which has the sole authority to seek both confidential and nonconfidential information from the parties supported by a subpoena power granted by statute and provided for in the Commission regulations. 19 U.S.C. section 1333(a) (1976); 44 Fed.Reg. 76470–71 (1979).

■ Within the scope and standard of the judicial review provided by the Trade Agreements Act of 1979, the court now directs its attention to the record of the administrative proceedings pending before it. Examination thereof clearly indicates the correctness of the Commission's negative finding with respect to the material injury or threat of material injury to an industry in the United States resulting from the importation of *finished rail passenger cars.* From the record it affirmatively appears that the plaintiff, as the sole active prime contractor dealing in the assembly of rail passenger cars in the United States at the time of the Commission's determination, constitutes this entire industry.

Regulations issued by the Urban Mass Transportation Authority, implementing the "Buy America" provisions contained in the Surface Transportation Assistance Act of 1978, provide (1) that the cost of the domestic components of a product, involved in a project in excess of $500,000, must exceed 50% of the cost of all its components, and (2) that the final assembly of the components to form the end product must take place in the United States. 49 C.F.R. § 660.22 (1979). The unrebutted evidence in the record discloses that in the Washington contract the instrument itself included the stipulation that the "Buy America" provision would be complied with. In the Cleveland contract, executed prior to the enactment of the "Buy America" provisions, the final assembly of the rail passenger cars was expressly agreed to be performed within Cuyahoga County, Ohio, United States. The record further discloses that Breda will use approximately 45% of American components and parts in the final assembly. The plaintiff in its original petition to the Commissioner of Customs, Department of the Treasury, has acknowledged that in the Southeastern Pennsylvania Transportation Authority (SEPTA) contract, although not a part of the record before this court, and presumably not examined by the Commission, compliance with the regulation relating to the "Buy America" provisions had been specifically agreed to.[3]

It would thus appear that the challenge of the petitioner to the findings of the Commission that there is no reasonable indication of material injury or threatened material injury to an industry in the United States by reason of the importation of *finished rail passenger cars* is without merit. Where in connection with the three contracts afore-referred to, it affirmatively appears without contradiction from the contract provisions or from supplementary testimony that the assembly of the respective rail passenger cars will be made in the United States, incorporating a significant percentage of the United States-made parts and components, a finding by the Commission that a material injury or threat of material injury exists to the rail passenger car industry by virtue of the *importation of finished rail passenger cars* from Italy and Japan would have been not only directly contrary to the undisputed evidence, but, indeed, arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

In the opinion of this court, however, the thrust of plaintiff's challenge to the Commission's negative determination with respect to its petition for the initiation of an antidumping duty investigation is misplaced. Only negligible attention has been given by the plaintiff, the intervenors parties-in-interest and by the Government to the allegations contained in the petition

---

3. *Washington Contract:* Administrative Record—Public Documents Transmitted to the United States Customs Court (Public Documents) No. 33(6), Amendment No. 9 to Invitation for Bid No. IFB–C–295 at BF–5.

*Cleveland Contract:* Public Document No. 33(7d) at 9; Public Document No. 30 at 91–92.
*Reference to SEPTA Contract:* Public Document No. 33(4) at 12.

with respect to the material injury or threat thereof to an industry in the United States by reason of the imports from Italy and Japan consisting of components and parts of the rail passenger cars. Nor does it appear from the record before the court that the Commission has made a thorough investigation required of it by statute with respect to:

(1) the sources, volume and prices of the components and parts contemplated to be imported in connection with the contracts in question, and

(2) the domestic suppliers of like components and parts in the United States, and

(3) the material injury or threat of material injury resulting thereto by reason of such importations.

From the findings of fact and the administrative record before the court, it would appear that there has been a lack of diligence by the Commission in seeking information available to it in the absence of such evidence having been presented by any of the parties to the investigative proceedings. The Commission, having in Findings Nos. 3 and 4 recognized that the prime contractors intended to import certain components and parts of rail passenger cars in the performance of the three contracts in question, seeks to justify its abstention from any further investigative responsibility by the adoption of Finding No. 5 providing:

The Commission sought but neither the petitioner nor any domestic manufacturer of car body shells and parts for truck assemblies came forward with any specific information or even allegations concerning the quantity or value of imported components. The only specific information available to the Commission at this time is that there have been no imports of these components by either respondent. (Staff Report, p. A–8; Transcribed Staff Briefing, Conference Transcript at 77, 100).

[4] In support of the Commission's apparent position, defendant and intervenors parties-in-interest have urged in their memorandum briefs to this court that upon the plaintiff, as petitioner, rests the burden of proof of all facts necessary to establish a reasonable indication of a material injury or threat thereof. No reference to any burden of proof is contained in the Trade Agreements Act of 1979, nor in the House Committee Report, nor in the Statement of Administrative Action thereon. The sole reference made thereto is contained in the Senate Committee Report wherein the "reasonable indication" standard of the statute is explained:

The committee intends the 'reasonable indication' standard to be applied in essentially the same manner as the 'reasonable indication' standard under section 201(c)(2) of the Antidumping Act has been applied. The burden of proof under section 733(a) would be on the petitioner. S.Rep., *supra*, at 66, U.S.Code Cong. & Admin.News 1979 at 452.

Whatever significance the foregoing statement should receive, it is manifest that the term "burden of proof" used in an investigative proceeding does not have the same meaning as when used in an adjudicatory proceeding. Clearly, in the latter instance the bearer of this burden would have a more extensive means of obtaining information to satisfy that burden.

It is the opinion of this court that the oblique reference to "burden of proof" contained solely in the Senate Committee Report can neither qualify nor minimize the duties or obligation imparted by the explicit language of the statute and the legislative history charging the Commission to make its preliminary determination "based upon the best information available." It must be emphasized that this mandate does not limit "the best information available" to that furnished by the petitioner or by any party-in-interest to the proceedings. The term "available" as used in the statute must be construed in accordance with its common meaning. In so doing, it is clear that all information that is "accessible or may be obtained," from whatever its source may be, must be reasonably sought by the Com-

mission.[4] It is only in this manner that the Commission can comply with the intended congressional mandate to conduct a "thorough investigation."

■ Turning to the findings of fact made by the Commission in support of its negative determination, the court confesses it has encountered difficulty in ascertaining the basis of the Commission's determination as well as in ascertaining the connection between the findings adopted and its negative determination.

The Statement of Administrative Action proposed to implement the Trade Agreements Act of 1979 advises that "[a] written statement of the reasons for the Commission's decisions on all material issues of law or fact presented shall be available to the parties and the public." Statement of Administrative Action at 27.[5] The importance of a statement of reasons given in support of an administrative determination has been clearly recognized by the Supreme Court in the case of *Securities and Exchange Commission v. Chenery*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947):

> [A] reviewing court in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.
>
> We also emphasized in our prior decision an important corollary of the foregoing rule. If the administrative action is to be tested by the basis upon which it

purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.'

Inasmuch as the Commission has not delineated any statement of reasons, the court in a review of its administrative determination can look only to the findings of fact and conclusions of law adopted by the Commission. Indeed, an independent examination of the record, in the absence of any explicit statement of reasoning, leaves the court in a quandary as to the basis of and theory underlying the Commission's findings of fact and resulting determination.[6]

The Commission makes a finding that the future delivery of parts to be used in the assembly of the rail passenger cars is speculative as to their sources and prices (Finding of Fact No. 7). It further finds that the actual sources for nearly all of the parts which the respondents intend to import for use and assembly of rail passenger cars could be domestic "because of the long lead times on delivery of finished rail cars." (Finding of Fact No. 4). In the opinion of the court, the administrative record indicates on the contrary, that the sources of components and parts were largely determinable. The record contains the statement of Breda that it intends to import car body shells and truck assemblies for use in connection with the Washington contract. The record likewise reveals that in its technical proposal accompanying its bid on and incorporated in the Washington contract Breda specifies in writing that it will build car

---

4. Webster's Third International Dictionary (1966).

5. H.R.Doc. No. 153, Part II, 96th Cong., 1st Sess. 415 (1979). The Statement of Administrative Action was expressly approved in section 2 of the Trade Agreements Act of 1979.

6. The court has taken note that the findings of fact adopted by the Commission in the subject proceedings are in marked contrast to the findings adopted in other unrelated proceedings conducted by the Commission under the Trade Agreements Act of 1979 in which the reasoning of the Commission has been set forth with specificity and clarity.

bodies and trucks at their plant in Italy.[7] Clearly, by its failure to recognize this contractual provision, included as a part of the administrative record, the Commission cannot be said to have based its finding on the "best information available."

The record further discloses that with respect to the Cleveland contract, executed in February of 1978, it was agreed that within days after the execution of the agreement, Breda and the Greater Cleveland Regional Transit Authority would meet in order to select an approved list of component suppliers.[8] Again, this court is supplied with no information as to whether the Commission sought from either the Greater Cleveland Regional Transit Authority or Breda the list of approved suppliers that were thus selected.

In connection with the Southeastern Pennsylvania Transportation Authority (SEPTA) contract, the record further discloses that the attorney for Nissho-Iwai at the public conference conducted by the Commission staff appeared with a document which the attorney identified as containing the names of suppliers. Although the attorney indicated his wish not to make this document an exhibit in view of its presumed confidential nature,[9] the record indicates no effort on the part of the Commission to procure the same either by way of a formal request or by the utilization of its subpoena power. It would appear self-evident that this very document may have proved valuable with respect to determining the source of components in connection with the contract in issue and undoubtedly may have provided such information sufficient to clarify the "speculation" which apparently existed in the mind of the Commis-

sion as evidenced by Finding of Fact No. 7. It is particularly noted that no contract documents in connection with the SEPTA contract were forwarded to this court as a part of the record. Accordingly, it is presumed that the Commission did not have the same before it when it made its determination.

In Finding of Fact No. 5, afore-quoted in full, it is stated that "[t]he Commission sought but neither the petitioner nor any domestic manufacturer of car body shells and parts for truck assemblies came forward with any specific information or even allegations concerning quantity or value of imported components." Although the components and parts in question may be imported into this country at a future date, to be utilized in the assembly of rail passenger cars of which the intervenors parties-in-interest are the prime contractors, the record discloses no information that the Commission sought from these very parties-in-interest the quantity or value of such components and parts that will be imported into the United States. The failure of the Commission to seek such information from the intervenors parties-in-interest, appearing in person before it, becomes even less understandable when, contrary to what the Commission has stated in Finding of Fact No. 5, plaintiff, Budd, has made specific allegations in its initiating petition with regard to the quantity and value of the parts that will be imported in connection with the SEPTA and Washington contracts.[10]

In Findings of Fact Nos. 8–12 the Commission, pursuant to its statutory obligations, considers the impact of imports on domestic producers of like products. From the foregoing findings it would appear that

---

7. Public Document No. 33(6) (Technical Proposal MS 107) at 1–1.

8. Public Document No. 33(7d) at 5–7.

9. Public Document No. 30 at 77.

10. Public Document No. 33(4) at Tables 9–12. Although Budd made no specific allegations in its initiating petition concerning the impact of components imported as "spare parts," pursuant to the contracts in question, this court questions the reasoning of the Commission in

presumably not investigating such an impact, particularly in light of the provisions in the Washington contract specifying the per unit prices of "spare parts" which Breda recommended, and a date certain (falling in early January 1980) by which the transit authority would determine such quantities it would purchase. Public Document No. 33(6), Invitation No. IFB–C–295; *Spare Parts*; Public Document No. 33(6), Amendment No. 9 to Invitation for Bid No. IFB–C–295 at IFB–15.

the Commission has erred in its concept as to the appropriate domestic industry upon which an impact of injury may be assessed. Section 771(4)(A) defines industry:

> (A) IN GENERAL.—The term 'industry' means the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product.

In section 771(4)(D), the statute provides for the determination of those domestic products to be considered in assessing the material injury or threat thereof by reason of the imports in question:

> (D) PRODUCT LINES.—The effect of subsidized or dumped imports shall be assessed in relation to the United States production of a like product if available data permit the separate identification of production in terms of such criteria as the production process or the producer's profits. If the domestic production of the like product has no separate identity in terms of such criteria, then the effect of the subsidized or dumped imports shall be assessed by the examination of the production of the narrowest group or range of products, which includes a like product, for which the necessary information can be provided.

In the absence of having ascertained in its investigation the identity of the domestic producers of the components and parts in question as well as the percentage share of the total domestic market for these components made by various producers, including the plaintiff, Budd, the findings adopted by the Commission provide this court upon its review no rational basis upon which the negative determination of the Commission can be thereby predicated.[11]

In summary, it is the opinion of the court that the Commission has not conducted a "thorough investigation" with respect to the allegations by the plaintiff that the importations of components and parts of rail passenger cars materially injure or threaten to materially injure a domestic industry. It has been acknowledged by the Commission that such allegations are and have been within the scope of its investigation from the initiation thereof.

The court is not unmindful of the time limitation placed upon the Commission by statute in its investigation prior to the making of its preliminary determination. Notwithstanding the pressure of time, however, the court cannot determine that the Commission has adopted its findings of fact on a rational basis where, in adopting the finding that the quantity or value of imported parts in connection with the contracts in question are speculative, the record fails to disclose a proper effort by the Commission in the investigative proceedings to seek such information from the prime contractors involved, who, at all times, were before the Commission as respondents parties-in-interest. Nor can the court ascertain any rational basis for the finding of the Commission that the sources of all components and parts under the contracts in question may be domestic where no apparent attention was given to the Washington contract in which it expressly appears in writing that the components and parts under investigation are to be produced in Italy.

Neither has the Commission conducted a "thorough investigation" commensurate with congressional intent, nor has it sought the "best information available" as required by statute.

In view of the foregoing, the court is compelled to remand the instant proceedings to the Commission for further consid-

---

11. In a colloquy between a member of the Commission and a senior investigator, it is evidenced that no information was sought nor received by the Commission from other domestic companies which formerly had produced rail passenger cars in the United States as to what components and parts, if any, they presently produce. Nor was any communication had between the Commission and any other domestic producers of the components and parts in question (Public Document No. 63 at 5, 7), notwithstanding that the record discloses the identity of certain domestic producers of such components and parts. Public Document No. 33(6), Amendment No. 9 to Invitation for Bid No. IFB–C–295 at IFB–3; Public Document No. 33(2) at Figures 17, 18.

eration of that information presently included in the administrative record as well as the best information which would have been available at the time of the original investigation and which might have been obtained from the intervenors parties-in-interest and the domestic industry relating to (1) the sources and prices of the components and parts for the rail passenger cars to be imported into the United States in connection with the contracts in question herein, and (2) the impact upon the relevant industry by reason of such imports. Within a period of thirty (30) days from the date of entry of this order, the Commission shall supplement its present findings of fact by the adoption of such additional findings and resulting conclusions of law as may be warranted, and upon further consideration of its determination, as might be necessitated thereby, submit all of the foregoing to this court.

Accordingly, the within action is remanded for further proceedings not inconsistent with this opinion.