**COMITEX KNITTERS, LTD., Plaintiff,**

v.

**UNITED STATES, Defendant,**

**and**

**National Knitwear and Sportswear Association, Defendant–Intervenor.**

**Court No. 90–10–00557.**

United States Court of International Trade.

Sept. 18, 1992.

Grunfeld, Desiderio, Lebowitz & Silverman, Max F. Schutzman, Bruce M. Mitchell, and Andrew B. Schroth, New York City, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Velta A. Melnbrencis; Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., (Rozann M. Stayden, Attorney–Advisor, of counsel), for defendant.

Gibson, Dunn & Crutcher, Donald Harrison and Judith A. Ott, Washington, D.C., for defendant-intervenor.

## MEMORANDUM OPINION

CARMAN, Judge:

Plaintiff moves for judgment upon the agency record, pursuant to Rule 56.1 of the Rules of this Court, contesting the final antidumping duty determination of the International Trade Administration ("ITA"), Department of Commerce ("Commerce" or "Department") in *Final Determination of Sales at Less Than Fair Value: Sweaters Wholly or in Chief Weight of Man–Made Fiber From Hong Kong,* 55 Fed.Reg. 30,-733 (July 27, 1990) ("Final Determination"). Defendant seeks to sustain the determination as supported by substantial evidence on the administrative record and as otherwise in accordance with law. Defendant-Intervenor joins Defendant.

## BACKGROUND

On September 22, 1989, the National Knitwear and Sportswear Association ("NKSA") filed an antidumping petition with Commerce alleging that man-made fiber sweaters ("MMF sweaters") were being sold in the United States at less than fair value ("LTFV"). On October 19, 1989, Commerce initiated an antidumping investigation, *Initiation of Antidumping Duty Investigation; Sweaters Wholly or in Chief Weight of Man–Made Fiber From Hong Kong, the Republic of Korea, and Taiwan,* 54 Fed.Reg. 42,972 (Oct. 19, 1989). On April 27, 1990, the Department published its preliminary determination finding a preliminary weighted-average dumping margin of 1.89%. *Preliminary Determination of Sales at Less Than Fair Value; Sweaters Wholly or in Chief Weight of Man–Made Fiber From Hong Kong,* 55 Fed.Reg. 17,775 (Apr. 27, 1990).

The Department published its final determination of sales at less than fair value on July 27, 1990, assigning Comitex a weighted-average dumping margin of 5.86%. *Final Determination,* Fed.Reg. at 30,744. Subsequently, on April 10, 1991, Plaintiff moved for judgment upon the agency record.

## CONTENTIONS OF THE PARTIES

Plaintiff is contesting the methodology employed by the Department in calculating constructed value to determine if Plaintiff was selling MMF sweaters at less than fair value. In contesting Commerce's calculation of constructed value, Plaintiff challenges Commerce's computations based on the following:

(1) Commerce's use of a simple average, instead of a weighted average for the fiscal year, as the "best information available" ("BIA") in its determination of yarn costs;

(2) Commerce's addition of 5% to Plaintiff's scrap determination to capture all waste;

(3) Commerce's failure to find a direct relationship between the purchase price of the MMF sweaters and the quota reservation fee and to make an upward circumstance of sale ("COS") adjustment to the United States Price ("USP") for the income earned from the quota reservation fee, instead of an offset to general expenses;

(4) Commerce's use of consolidated general and administrative and financial expenses of Comitex Holdings, Limited

("CHL"), instead of general and administrative and financial expenses of Comitex only, in its determination of the constructed value of MMF sweaters produced by Comitex; and

(5) Commerce's refusal to consider data submitted after verification that revised incorrect information submitted during verification.

For the above reasons, Plaintiff argues Commerce undervalued the constructed value and incorrectly determined the antidumping duty margin for Comitex's import of MMF sweaters.

In response to Plaintiff's contentions, Commerce first asserts that its utilization of a simple average was properly employed versus the utilization of a weighted-average.

Second, Commerce asserts in support of its methodology in determining scrap costs that Plaintiff's scrap calculations could not be verified and did not appear to account for all waste; therefore, Commerce resorted partially to the use of BIA.

Third, Commerce argues that the quota reservation fee was not directly related to the sale of the MMF sweaters and, therefore, it was not considered part of the purchase price. Furthermore, Commerce states that a circumstance of sale adjustment is properly made to foreign market value, not United States price.

Commerce next asserts that the aggregate general and administrative ("G & A") expenses of Comitex submitted during verification was the only verified information Commerce possessed concerning Comitex's expenses. Therefore, such information was correctly relied on in determining constructed value in accordance with Commerce's standard practice of utilizing a proportionate share of general and administrative expenses incurred by the parent company in determining constructed value.

Finally, Commerce states that it refused to accept Comitex's late submission of consolidated audited financial statements because such statements were unverified and the statutory time frame in which they were to be submitted had expired.

Defendant and Defendant–Intervenor request the Court to sustain Commerce's final affirmative antidumping duty determination based on substantial evidence on the administrative record and in accordance with law.

## STANDARD OF REVIEW

This Court must uphold the ITA's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 3 Fed.Cir. (T) 44, 51, 750 F.2d 927, 933 (1984) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938) and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). The Court should sustain an agency determination if a reasonable mind finds such determination adequate to support a conclusion based on the record as a whole. *Negev Phosphates, Ltd. v. United States*, 12 CIT 1074, 1076, 699 F.Supp. 938, 942 (1988) (citing *Pierce v. Underwood*, 487 U.S. 552, 564–65, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988)).

## DISCUSSION

### Defendant's Methodology Employed in Computing Yarn Cost

In the present case, Commerce resorted to the use of a simple average, instead of a weighted-average, as the best information available. The use of averaging is provided for by the Tariff Act of 1930 for the purpose of determining United States price or foreign market value, whenever a significant volume of sales is involved or a significant number of adjustments to prices are required. 19 U.S.C. § 1677f–1 (1988). The regulation mandates that the Secretary's final determination will include an estimated weighted-average dumping margin. 19 C.F.R. § 353.20(a)(2)(ii) (1989).

Plaintiff challenges Commerce's use of a simple average, arguing a weighted-aver-

age is the preferred methodology and, therefore, should have been utilized in the present case. *See Photo Albums and Filler Pages From Hong Kong; Final Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 43,751 (1985); *Iron Construction Castings From the People's Republic of China; Preliminary Results of Antidumping Duty Administrative Review,* 55 Fed.Reg. 22,939 (1990); *Color Television Receivers, Except for Video Monitors, From Taiwan; Final Results of Antidumping Duty Administrative Review,* 53 Fed.Reg. 49,706 (1988).

In Commerce's questionnaire to Comitex, the computation of the actual cost of yarn for the period of investigation was requested in accordance with generally accepted accounting principles ("GAAP"). Confidential Document ("C.R.Doc.") 105 at 2. If the company's cost accounting system did not record the cost of materials on a per sweater basis pursuant to GAAP, the questionnaire indicated that the company was then to detail the method it used to calculate the cost of materials for the period of investigation. *Id.* at 9.

Comitex indicated in its response that it was unable to compute the actual cost of yarn for the period of investigation because it used a moving or rolling average cost per pound to value inventory and could not determine from its regularly maintained records which yarn purchase lot, or combination of lots, was used to fill a particular production order. Instead, Comitex supplied Commerce with average yarn cost figures calculated over the fiscal year including the cost of yarn for the period of investigation, finding this was the most reasonable way to determine yarn costs. C.R.Doc. 79 at 8. Comitex explained its method to calculate the cost of materials for the period of investigation:

> Comitex calculated the actual average yarn cost for six acrylic yarn types by yarn type for January–December, 1989, by adding all purchases in dollars and dividing by the all purchases weight to get a yarn cost/lb.. Comitex then calculated a scrap rate per yarn by taking beginning inventory, adding all purchases during the year, and subtracting end-

ing inventory at 12/31/89 to get yarn usage in pounds for the year. The yarn usage was compared to actual weight of all garments shipped during 1989 using that particular yarn type to calculate the usage variance (scrap) per yarn type. Comitex then took the net shipped weight per sweater type and increased it to the estimated gross input weight of yarn by the scrap factor. This gross input weight was then multiplied by the average yarn cost to obtain a yarn cost by sweater.

*Id.* at 9.

In these calculations, Commerce argues that Comitex failed to establish that yarn purchased during any month was used to produce the sweaters under investigation. Moreover, Comitex admitted in its Prehearing Brief that its records were unreliable and did not coincide with actual usage. C.R.Doc. 86 at 2. Commerce found no indication that Comitex's accounting system could derive an accurate determination of the monthly yarn quantities used in production during the period of investigation because its computations included costs for the fiscal year, rather than only for the period of investigation. *Id.* Commerce refused to rely on Comitex's methodology arguing that a weighted-average computation of yarn costs for the fiscal year 1989 would distort the true dumping margin. As an alternative, Commerce used a simple average of the per pound prices paid by Comitex during the three months which the sweaters under investigation were produced. Commerce explained its resort to a simple average in its final determination:

> [T]he Department did not rely on the average 1989 fiscal year yarn costs for each type of yarn used by Comitex in its submission since these averages may have included the cost of yarn used for sweaters which were not subject to this investigation.... [T]he Department used the simple average of the purchase costs for each yarn type from July through September as the best information available in accordance with Section 776(c) of the Act.

55 Fed.Reg. at 30,741. Commerce used a simple average only for those types of yarn which Comitex could not show were used in production. C.R.Doc. 97 at 3775, 3820–27. Comitex argues that Commerce's resort to the use of a simple average significantly distorted material costs.

■ Commerce was under no obligation to change its method of computing material costs because of Comitex's inability to comply with Commerce's questionnaire or because the material costs determination would not be favorable to Comitex. The Plaintiff may not control the investigation by "selectively providing the ITA with information." *Olympic Adhesives, Inc. v. United States*, 8 Fed.Cir. (T) ——, ——, 899 F.2d 1565, 1572 (1990). "It is for the ITA to conduct its antidumping investigation the way it sees fit, not the way the interested party seeks to have it conducted." *N.A.R., S.p.A. v. United States*, 14 CIT ——, ——, 741 F.Supp. 936, 941 (1990).

■ Comitex requests the Court to direct Commerce to utilize its weighted average methodology. However, this Court's function is not to formulate a specific methodology for use by the administration; rather, it is to ensure that the ITA's methodology is a reasonable means of effectuating the statute's purpose and is supported by substantial evidence in the record. *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404, 409, 636 F.Supp. 961, 966, 969 (1986), *aff'd*, 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)). In *Ceramica Regiomontana*, the Court upheld the ITA's determination that the figures compiled by the Mexican government were insufficient to calculate an accurate national average. Instead, the ITA applied a fifteen percent (15%) standard benefit as the basis of its calculations. *Ceramica Regiomontana*, 10 CIT at 409, 636 F.Supp. at 969.

In the present case, Commerce argues that the simple average yarn purchases were used as the best information available because the figures submitted by Comitex relied upon materials purchased outside the period of investigation. Commerce derives its BIA authority from the Tariff Act of 1930, which provides that:

> In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information available.

19 U.S.C. § 1677e(c) (1988). In congruence with the code, 19 C.F.R. § 353.37 (1989) provides:

> (a) *Use of Best Information Available.* The Secretary will use the best information available whenever the Secretary: (1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or (2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.

Commerce must exercise its discretion in determining BIA when a manufacturer or exporter fails to supply the requested information. *Tai Yang Metal Indus. Co. v. United States*, 13 CIT 345, 350, 712 F.Supp. 973, 977 (1989) (citing *Chemical Prods. Corp. v. United States*, 10 CIT 626, 634, 645 F.Supp. 289, 295 (1986)). When Commerce employs BIA, it need not be the best information or accurate information. *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT 13, 28, 704 F.Supp. 1114, 1126 (1989), *aff'd*, 8 Fed. Cir. (T) ——, 901 F.2d 1089 (1990). The BIA may include "all information that is accessible or may be obtained, whatever its source." *Timken Co. v. United States*, 11 CIT 786, 788, 673 F.Supp. 495, 500 (1987) (citing *Budd Co. v. United States*, 1 CIT 67, 75, 507 F.Supp. 997, 1003–04 (1980)).

As a result of Comitex's inability to comply with Commerce's request for information, Commerce employed a simple average as the BIA. Commerce refused to rely on the weighted average 1989 fiscal year yarn costs computed by Comitex because this average may have included yarn used for sweaters not produced during the period of

investigation, thereby resulting in an inaccurate dumping margin determination. 55 Fed.Reg. at 30,741. This Court holds that Commerce properly used a simple average, instead of a weighted-average, pursuant to its BIA authority in determining material costs, and that this issue is based on substantial evidence on the administrative record and in accordance with law.

*Commerce's Computation of Yarn Scrap*

In Commerce's calculation of constructed value, Commerce requested Comitex to provide it with the method in which waste was calculated and to provide the average percentage of waste for each type of sweater. Administrative Record Document ("A.R.Doc.") 166 at 3. Comitex indicated it calculated the scrap factor for each of the six yarns used based upon the difference between total usage, by weight, for 1989 versus total actual weight of that yarn type contained in all sweaters produced. C.R.Doc. 79 at 9. Thereby, Comitex asserts, it accounted for all waste, including unused dyed yarn. Comitex also included in its response the waste percentage for each type of yarn. C.R.Doc. 50 at 6.

Commerce determined after a factory tour of the petitioner's domestic industry, which also produces MMF sweaters, that Comitex's method of computing scrap did not capture all waste occurring during sweater production. C.R.Doc. 327 at 3754. Therefore, Commerce added an additional five percent (5%) to account for all scrap under its BIA authority. *Id.*

According to 19 U.S.C. § 1677e(b) (1988), Commerce must report the methods and procedures used to verify the information relied on in making its final determination. If Commerce cannot verify information submitted, it is to use BIA in making its determination. 19 U.S.C. § 1677e(b) (1988). Commerce, however, failed to indicate in its final determination, other than by the tour of the domestic industry, its methods and procedures employed to verify the informa-

tion it relied on in making its final determination. C.R.Doc. 79.

During its tour of the petitioner's production plant in December 1989, Commerce observed the factory's production procedures finding that five percent of the yarn input by this domestic industry remained after the knitting process. *Final Determination,* 55 Fed.Reg. at 30,739. Informed by the petitioner that similar production procedures existed between Comitex and the domestic industry, Commerce determined that the scrap figures submitted by Comitex did not capture all waste, leaving unaccounted for yarn dyed but not entered into production. C.R.Doc. 327 at 3754; *see* C.R.Doc. 26 at 1546. Commerce, therefore, based its calculations of scrap costs in part upon Comitex's calculations and in part on best information available by adding five percent to Comitex's scrap cost to capture unused but dyed yarn. *Final Determination,* 55 Fed.Reg. at 30,739.[1]

The five percent figure added to Comitex's scrap factor was derived from the yarn remaining after the domestic industry's knitting process. C.R.Doc. 26 at 1547. The domestic industry employs knitting machines to complete its knitting process. *Id.* However, Comitex has indicated it employs a different manufacturing process, therefore, its waste factor cannot be the same as the industry toured by Commerce. More specifically, Comitex has its sweater panels knit to shape initially without any need for cutting. The panels are then looped and joined by a special knitting process. C.R.Doc. 79 at 5–6. Comitex does not employ the "cut and sew" method utilized by the domestic factory which, it argues, produces a larger sum of waste than Comitex's procedure of knitting and looping.

In no subsequent questionnaires did Commerce request an explanation from Comitex regarding the disposition of unused dyed yarn in its scrap factor. "To avoid the threat of § 1677e(b), a submitter need only provide complete answers to the

---

1. Commerce's partial reliance on BIA has been previously approved by this Court. *See Ansaldo Componenti S.p.A. v. United States,* 10 CIT 28,

628 F.Supp. 198 (1986); *Chinsung Indus. Co. v. United States,* 13 CIT 103, 705 F.Supp. 598 (1989).

questions presented in an information request." *Olympic Adhesives, Inc. v. United States,* 8 Fed.Cir. (T) ——, ——, 899 F.2d 1565, 1574 (1990). Not only did Commerce fail to request information needed from Comitex to accurately and completely make a final determination, but Commerce also failed to indicate the methods and procedures it utilized during verification as required by law.

■ This Court holds that Commerce's reliance partially on BIA by the addition of five percent to Comitex's scrap cost is unsupported by substantial evidence on the administrative record and is not in accordance with law. Commerce is directed to ascertain an explanation from Comitex regarding the deposit of unused dyed yarn in its scrap factor. Commerce is also directed to indicate the methods and procedures it utilized during verification. If the information that Commerce seeks is available and properly verifiable, then Commerce is directed to make the appropriate calculation. If the information is not available, then Commerce is directed to use the best information available in its computation of constructed value.

### Quota Related Revenue

This Court must determine whether the quota-related revenue received by Comitex from its United States buyer to reserve part of Comitex's quota for MMF sweaters, is directly related to the sales of such MMF sweaters. The controlling statute states in pertinent part:

> In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to ... (B) other differences in circumstances of sale ..., then due allowance shall be made therefor.

19 U.S.C. § 1677b(a)(4) (1988). The statute places upon Comitex the burden of proving that any difference between the United States price and foreign market value was wholly or partly due to the differences in circumstances of sale. The implementing regulation similarly provides:

> (a) *In general.* (1) In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such difference. In general, the Secretary will limit allowances to those circumstances which bear a *direct relationship* to the sales compared.

19 C.F.R. § 353.56(a)(1) (1989) (emphasis added).

It is a well established rule that there be a direct relationship between the claimed adjustments and the sales under consideration to make a circumstance of sale adjustment and that Commerce need not make adjustments for indirect expenses. *See Smith–Corona Group v. United States,* 1 Fed.Cir. (T) 130, 713 F.2d 1568 (1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1983); *Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.,* 3 Fed.Cir. (T) 83, 753 F.2d 1033 (1985).

In order for Comitex to import MMF sweaters to the United States, Comitex must possess a quota and the necessary export license retained from its government. Comitex possessed a quota in excess of 90,000 dozen for the export of MMF sweaters. In 1989 Comitex entered into an agreement with one of its major United States customers to reserve, on behalf of the customer, a sum certain of the quota for the purchase of MMF sweaters. C.R.Doc. 32 at 11.

Comitex asserts that although the reservation fee was paid before the sweaters were purchased, no sale or transfer of the quota was made, and the payment of the invoice price and the quota fee was one transaction. *See* C.R.Doc. 79 at 14. Comitex argues that a direct relationship existed between the price paid for the quota reserved and the sale of the sweaters to this customer. The customer paid U.S. dollars per dozen only for the precise quantity of MMF sweaters purchased by it and was

refunded U.S. dollars for the unused portion of the reserved quota. *See* C.R.Doc. 68 at 4, 5.

Commerce argues that because the reservation fee was paid before the sweaters were ordered, no link existed between the reservation fee and the price paid by the customer and two wholly separate transactions occurred. 55 Fed.Reg. at 30,740. However, Commerce did find evidence during verification that revenue earned through the quota reservation was "tied to sales of MMF sweaters to this customer yet, not directly related." *Id.* Therefore, Commerce concluded that a direct relationship did not exist, but did determine that a sufficient link between income and sales was present to permit an adjustment to the foreign market value by offsetting general expenses by the revenue obtained from the quota reservation. *Id.*

Comitex argued that an adjustment is appropriate, but that the revenue from the quota reservation should have been used as a circumstance of sale adjustment to the United States price for all sales to this customer. In support of this theory Comitex incorrectly relies on *Final Determinations of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 54 Fed.Reg. 18,992 (1989). In this case, Commerce made an adjustment to the foreign market value, not the United States price, upon its finding of a direct relationship to sales. 54 Fed.Reg. at 18,994. This adjustment is in accordance with the applicable statute and regulation, 19 U.S.C. § 1677b(a)(4) and 19 C.F.R. § 353.56(a)(1) (1989), which authorize a circumstance of sale adjustment when computing the foreign market value.

It is not clear to this Court how Commerce determined that revenue earned through the quota reservation was "tied to sales of MMF sweaters to this customer yet, not directly related." Commerce is directed to explain its rationale for its determination that the revenue earned is not directly related. Furthermore, if after having reexamined this question, Commerce

determines that revenue earned through the quota reservation is directly related to sales of MMF sweaters, Commerce is directed to make the appropriate circumstance of sale adjustment.

## *Use of Consolidated Financial Data*

In the investigation under review, the consolidated general and administrative expenses reflected in the unaudited consolidated financial statements of Comitex for the year ending December 31, 1989, were used in Commerce's constructed value calculations. 55 Fed.Reg. 30,740. Comitex is a subsidiary of Comitex Holdings, Limited ("CHL"), a Hong Kong company. C.R.Doc. 79 at 4, 5. Comitex itself has three different factories producing MMF sweaters and a separate administrative facility. *Id.*

In Commerce's attempt to construct a value for the MMF sweaters under investigation, Commerce forwarded several questionnaires to Comitex. In the cover letter accompanying section A of the first questionnaire, Comitex was notified that consolidated corporate responses were requested. A.R.Doc. 105 at 105. In section D of the questionnaire, Commerce explained that constructed value included "general and administrative expenses of the corporate headquarters [and] interest expenses of the corporate family" and reiterated Commerce's request for the company's audited financial statements for the fiscal years covered by the period of investigation. C.R.Doc. 210 at 2, 5. In addition, section D also stated that the interest expense should include all interest expenses from unrelated sources as reported in the consolidated financial statements. *Id.* at 13.

In Comitex's response to section D of the questionnaire, Comitex indicated that its accounting system runs on the fiscal year January 1 through December 31, and that it would not be able to immediately submit 1989 financial statements. C.R.Doc. 37 at 3. However, Comitex submitted for the period ending December 31, 1987, audited financial statements for Comitex and its subsidiaries, and for the period ending De-

cember 31, 1988, audited financial statements for Comitex only. C.R.Doc. 79 at 7.

The Department determined that Comitex's responses to section D were incomplete because Comitex failed to submit audited financial statements for 1989 and explain how it calculated general and administrative expenses. A.R.Doc. 166 at 2, 5. Thereafter, Commerce sent Comitex a deficiency and supplemental questionnaire, requesting copies of audited financial statements not yet submitted and an explanation of the method used to allocate the company's general and administrative expenses. A.R.Doc. 230 at 2. In this request, Commerce acknowledged the delay Comitex was having in obtaining its financial statements and requested Comitex to submit such as soon as possible. *Id.* In Comitex's response to this questionnaire it indicated that the audited financial statements would be available at the end of March 1990 and explained how it calculated general and administrative expenses on a quarterly basis. C.R.Doc. 50 at 11.

Two weeks prior to verification, Commerce forwarded to Comitex its verification agenda, indicating it would review the company's consolidated financial expenses, including the allocation of consolidated expenses to subsidiaries. A.R.Doc. 248 at 3402. Commerce also indicated that it would not accept new information at verification. *Id.*

On the last day of verification, Commerce requested, and did receive, a preliminary unaudited financial statement consolidating annual sales and cost data for Comitex and all directly and indirectly related entities for 1989. Following verification Comitex discovered such calculations were incorrectly computed. C.R.Doc. 79 at 23. In an attempt to correct such error, Comitex forwarded to Commerce an auditor's letter summarizing the consolidated costs of sales, interest expenses, and office and general expenses for 1989. C.R.Doc. 83 at 2. Nevertheless, Commerce included a proportional amount of the general and administrative and financial interest expenses of these companies using the unaudited consolidated financial statements of CHL, sub-

mitted during verification, in the constructed value allocation ratios for MMF sweaters manufactured by Comitex. 55 Fed. Reg. at 30,740.

As of the end of verification, financial statements for the period ending December 31, 1989, were available but had not received the auditor's opinion. C.R.Doc. 79 at 7. Comitex submitted the auditor-certified data on June 14, 1990. C.R.Doc. 83 at 2.

Comitex submits that Commerce's use of aggregate general and administrative expenses incurred in 1989 by all directly and indirectly related companies is inappropriate in its calculations of the constructed value of MMF sweaters. In determining constructed value, the statute mandates that the constructed value of imported merchandise shall be the sum of the following:

> [A]n amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation.

19 U.S.C. § 1677b(e)(1)(B) (1988).

Comitex has stated that none of the CHL companies have any related activities to the production of sweaters, except one company which supplies computer related services. C.R.Doc. 37 at 6. Comitex allocated this company's total overhead to Comitex based upon the company's direct labor expended for the benefit of Comitex. *Id.* Verification confirmed Comitex's assertion that no CHL entities, except the one company, had anything to do with the production of MMF sweaters. Commerce verified Comitex's general and administrative and interest expenses for the period of investigation which included the expenses incurred by the one CHL company for the benefit of Comitex, yet Commerce utilized the consolidated expenses in computing constructed value. C.R.Doc. 79 at 2, 3.

Commerce supports its use of consolidated financial statements arguing that Commerce's practice when determining constructed value is to request a proportionate share of any general and administrative expenses incurred by its parent or holding

company to be included in its general expense calculation. In *Final Determination of Sales at Less Than Fair Value: Certain Small Business Telephone Systems and Subassemblies Thereof From Korea*, 54 Fed.Reg. 53,141 (1989) and *Final Determination of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany*, 54 Fed.Reg. 18,992 (1989), Commerce included a proportionate share of general and administrative expenses incurred by the parent company in its calculation of constructed value because the parent company actually incurred such expenses. Commerce requests such information because a parent company generally incurs management and other expenses on behalf of the operating company and does not pass on such expenses to the operating company or only charges the operating company a nominal fee. However, such expenses were not incurred by the parent company in the present case.

Comitex, however, argues that Commerce has previously determined if the activities or functions of a consolidated subsidiary or parent company are not related, then their expenses will not be included in the cost of production. *Frozen Concentrated Orange Juice From Brazil: Final Determination of Sales at Less Than Fair Value*, 52 Fed.Reg. 8324 (1987); *Cellular Mobile Telephones and Subassemblies From Japan: Final Determination of Sales at Less Than Fair Value*, 50 Fed. Reg. 45,447 (1985). In *Frozen Concentrated Orange Juice*, Commerce declined from including general and administrative expenses incurred by the consolidated subsidiaries because their business was unrelated to the production of orange juice. 52 Fed. Reg. at 8329. Similarly, in the present case, the business conducted by all the CHL entities, except one, is not related to the production of MMF sweaters. In *Cellular Mobile Telephones*, Commerce stated that it included a proportionate share of general and administrative expenses for those functions which were related to the production of cellular mobile telephones. 50 Fed.Reg. at 45,456. Comitex has indicated that only one company has related functions and that such expenses attributable to that company were accounted for in Comitex's general and administrative expense calculation. C.R.Doc. 37 at 6.

Because Commerce's verification report failed to reveal any CHL entities, except for the one above, that provided directly related services to Comitex with respect to the subject merchandise, this Court holds that the consolidated financial statements were wrongfully employed by Commerce in determining constructed value. The use of the consolidated financial statements fails to indicate the general expenses and profit equal to that usually reflected in sales of similar merchandise as required by statute. *See* 19 U.S.C. § 1677b(e)(1)(B). The Court remands this issue. On remand, Commerce is directed to reexamine the consolidated financial statements of Comitex Holdings, Limited to determine the proportional amount of all relevant expenses which are directly related to Comitex. If Commerce, determines that adjustments are required, then this Court directs Commerce to make such adjustments.

Commerce further argued that it refused to utilize Comitex's post-verification submission because, in accordance with 19 C.F.R. § 353.31(a) and its notification to Comitex in its cover letter attached to section A of the questionnaire, as a general rule, Commerce was under no obligation to accept any information after verification.

Nevertheless, because Commerce asked for additional information at verification, was advised by Comitex that the information supplied had not yet been audited, and subsequent to verification, Comitex submitted a corrected consolidated audited statement, in the interest of fairness and accuracy under the circumstances of this case, Commerce is directed to secure and examine the consolidated audited statements submitted after verification and report its findings to this Court. Commerce is further directed, based upon the information, if any, gleaned from the consolidated audited statement submitted to make any adjustments determined to be necessary.

## CONCLUSION

In accordance with the foregoing, this Court concludes that Commerce's final determination as pertains to Commerce's use of a simple average is reasonable, based on substantial evidence in the record, and in accordance with law. This Court, however, remands the remaining issues as set forth in this opinion to Commerce to revisit its computations, consistent with this opinion.