**INDUSTRIAL FASTENERS GROUP, AMERICAN IMPORTERS ASSOCIATION, Plaintiff,**

v.

**The UNITED STATES, et al., Defendants.**

**Court No. 80–7–01157.**

United States Court of International Trade.

Oct. 29, 1981.

Barnes, Richardson & Colburn, New York City (Andrew P. Vance and Michael A. Johnson, New York City, on the briefs), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, New York City (Velta A. Melnbrencis, New York City, on the brief), for defendants.

*Opinion and Order*

BOE, Judge:

Plaintiff, an association of importers and wholesalers of industrial fasteners manufactured in India, brings this action under 19 U.S.C.A. § 1516a(a)(2)(A)(ii), § 1516a(a)(2)(B)(i), contesting the final affirmative countervailing duty determination and order by the International Trade Administration (ITA), United States Department of Commerce, in *Certain Fasten-*

*ers From India,* 45 Fed.Reg. 48607 (published July 21, 1980).

On February 25, 1980, a notice of the Initiation of Countervailing Duty Investigation was published in the Federal Register, advising:

that a satisfactory petition has been received and as a result an investigation is being started [by the ITA] for the purpose of determining whether or not benefits are granted by the Government of India [GOI] to manufacturers, producers, or exporters of certain industrial fasteners [covered under item numbers 646.-49, .54, .56, .58, .60, .63, TSUS] constitute a bounty or grant within the meaning of the countervailing duty law.

Having concluded that India was not a "country under the Agreement" within the meaning of 19 U.S.C.A. § 1671(b), the ITA determined that the investigation was governed by § 303 of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, 19 U.S.C.A. § 1303, and accordingly, the investigation would not be referred to the International Trade Commission (ITC) for injury determinations. 45 Fed.Reg. 12276.

On July 21, 1980, the ITA published the countervailing duty determination and order appealed from in the instant action, in which the ITA determined that "the Government of India provides bounties or grants (subsidies) within the meaning of section 303 of the Act and that the estimated aggregate net amount of these benefits equals 18.0% of the f. o. b. value of the exported merchandise." The customs officers were directed to assess a countervailing duty on imports covered by the determination pursuant to 19 U.S.C.A. § 1671e.

The proceedings in this court were commenced by the filing of a summons and complaint on July 28, 1980. Plaintiff, on the same date, made application to this court for a Temporary Restraining Order and preliminary injunction, which were granted on July 28, 1980 and August 7, 1980, respectively. Pursuant to the preliminary injunction, the Customs Service was enjoined from liquidating merchandise pursuant to the countervailing duty order of July 21, 1980.

This civil action was submitted for determination pursuant to the expedited review procedure of Rule 56.1 of the United States Court of International Trade Rules.

The ITA has determined in its final determination that the Government of India provided subsidies to exporters of certain industrial fasteners through three programs: (1) Cash Compensatory Support on Export (CCS), providing a lump-sum payment of 17.5% of the f. o. b. value of the exported merchandise; (2) Preferential Export Financing, whereby the GOI had underwritten low interest packing credit loans to exporters by making grants of 1.5% of the interest rate to lending institutions, amounting to a subsidy of 0.4% of the f. o. b. value of the exported merchandise; (3) Tax Deductions, providing special income tax deductions of 133% of certain expenses incurred in export market development, amounting to a subsidy of 0.1% of the f. o. b. value of the exported merchandise.

Notwithstanding the several assignments of error asserted by plaintiff in its Motion for Judgment on the Administrative Record the central dispositive question to be decided herein in reviewing the ITA's determination with respect to the CCS payments, is whether there is substantial evidence in the administrative record to support the conclusion that the CCS payments to exporters of fasteners are not non-excessive rebates of indirect taxes not otherwise rebated on export, and, accordingly, are subsidies.

According to the information submitted by the Government of India, in October 1978 the Ministry of Commerce advised all Export Promotion Councils (EPCs) that it was restructuring the export payment programs and that the Ministry had decided that CCS should fully compensate for all types of indirect taxes which exporters pay on "inputs" and which are not otherwise refunded. AR. 70. However, the letter from the Ministry advising the EPCs of such restructuring (to which was appended a "proforma" [questionnaire]) stated that the main objective of the CCS should be to

help neutralize handicaps faced by Indian exporters, vis-à-vis their foreign competitors, in the form of (i) indirect taxes on "inputs," (ii) higher rate of interest payable on working capital employed on export production, and (iii) higher cost of domestic capital goods used on export production. AR. 879. In addition to the foregoing three types of handicaps, the Ministry advised of other broad criteria that would likely be accepted in the formulation of the new CCS rates.[1] AR. 880. The EPCs (including the Engineering Export Promotion Council [EEPC], representing industrial fastener exporters) were requested to collect, compile, verify and make available to the Ministry basic data in regard to all the products with which they are concerned, the data to be collected from a representative number of manufacturing and exporting units throughout the country. AR. 71, 878, 880. The representative manufacturers/exporters were to work out the average incidence of the various non-refundable taxes, duties and levies imposed on "inputs" entering the exported products. AR. 71. However, the "proforma" appended to the Ministry's letter to the EPCs demonstrates that the scope of the data to be supplied by the representative manufacturing/exporting units was more extensive than just the incidence of indirect taxes, duties and other levies on "inputs." Rather, the "proforma" requested information with respect to the eight broad criteria afore-referred to. AR. 882–91. The Government of India has stated that the tax data was scrutinized by the Ministry and that the CCS was based directly on the calculations and documentation provided by EPC members. AR. 71.

The CCS payment for industrial fasteners originally was set at 12.5%. The industrial fastener manufacturers, however, objected to that rate as being too low to compensate

for all indirect taxes and levies and the Ministry announced in March 1979 the higher payment rate of 17.5%. The new payment rates which became effective April 1, 1979, were in most cases, to remain in effect for three (3) years. AR. 434. Counsel for the EEPC submitted to an ITA official, during the course of her duties in verifying information in India, documents from six (6) Indian industrial fastener firms (one unidentified) and an industry group, providing tax calculations, which, counsel asserts,

> were done in *1978/79* for the express purpose of setting cash compensatory support for industrial fasteners. These calculations were submitted to the Ministry of Commerce by the Engineering Export Promotion Council and were the basis for the CCS granted in 1979. [Emphasis in original.]

AR. 441–42.

19 U.S.C.A. § 1303, as amended, governs the imposition of countervailing duties on merchandise which is the product of a country other than a "country under the Agreement" within the meaning of 19 U.S.C.A. § 1671(b). Section 1303(b) provides that the countervailing duty imposed under § 1303(a) "shall be imposed, under regulations prescribed by the administrative authority (as defined in [19 U.S.C.A. § 1677(1)]), in accordance with [19 U.S.C.A. §§ 1671–1677g, as added by the Trade Agreements Act of 1979] (relating to the imposition of countervailing duties).[2]

In the Senate Committee Report to the Trade Agreements Act of 1979, the following comments were made with respect to the amendments made to § 1303 by the 1979 Act, S.Rep.No. 96–249 at 104, U.S.Code Cong. & Admin. News 1979, 381, 490:

> The committee believes the procedures and standards under new [§§ 1671–1677g]

---

1. These include: (iv) labour intensive industries; (v) products of SSI (Small Scale Industries) and cottage sector; (vi) new products in new markets; (vii) selected processed food, horticulture and agricultural products; (viii) commodities and markets which suffer from high and discriminatory freight rates.

2. Section 1303(b) prescribes that certain countervailing duty investigation procedures added by the Trade Agreements Act of 1979 are not applicable to investigations governed by § 1303. Most notably, injury determinations by the ITC are not made in § 1303 investigations. The court concludes, however, that none of these exceptions are applicable to the disposition of the action herein.

are a significant improvement over existing law and practice and should be applied to [§ 1303].

It clearly was the intent of Congress that those provisions of the Trade Agreements Act of 1979 relevant to countervailing duty investigations be applied to investigations governed by § 1303, with the exceptions noted.

The statutory standard for the imposition of countervailing duties is provided in § 1671(a), which states in pertinent part:

(a) General rule.—If—

(1) the administering authority determines that—

(A) a country under the Agreement, or

(B) a person who is a citizen or national of such a country, or a corporation, association, or other organization organized in such a country,

is providing, directly or indirectly, a subsidy with respect to the manufacture, production, or exportation of a class or kind of merchandise imported into the United States, ...

then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net subsidy.

The term "subsidy" is defined in § 1677(5), providing in relevant part:

(5) Subsidy.—The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and includes, but is not limited to, the following:

(A) Any export subsidy described in Annex A to the Agreement [on Subsidies and Countervailing Measures] (relating to illustrative list of export subsidies).

The definition of "net subsidy" is provided in § 1677(6):

(6) Net subsidy.—For the purpose of determining the net subsidy, the administering authority may subtract from the gross subsidy the amount of—

(A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the subsidy,

(B) any loss in the value of the subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and

(C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the subsidy received.

The legislative history to the Trade Agreements Act of 1979 provides insight into the standards set by the terms aforedefined and their relationship to the law then in effect.

The definition of "subsidy" is intended to clarify that the term has the same meaning which administrative practice and the courts have ascribed to the term "bounty or grant" under section 303 of the Tariff Act of 1930, unless that practice or interpretation is inconsistent with the bill. In this regard, the restrictions on offsets contained in section 771(6) of the Tariff Act of 1930, as added by this bill [§ 1677(6)], are not intended to prohibit the authority from determining that export payments are not subsidies, *if those payments are reasonably calculated, are specifically provided as non-excessive rebates of indirect taxes within the meaning of Annex A of the Agreement, and are directly related to the merchandise exported ...*

... The term "net subsidy" is not used in the existing countervailing duty law, section 303 of the Tariff Act of 1930. Under section 303, the Secretary of the Treasury does determine the "net amount" of a bounty or grant, but this phrase is undefined. Under current practice, the Secretary determines the net amount by subtracting from the gross amount of the bounty or grant used certain "offsets," such as indirect taxes on items physically incorporated in the exported product but not rebated upon export ...

\* \* \* \* \* \*

... The bill [later enacted as the Trade Agreements Act of 1979] defines the term "net subsidy" to place clear limits on offsets from a gross subsidy. The gross subsidy is the value of the subsidy

provided, or made available, and used. For example, if a firm is eligible for a tax credit as a result of locating a plant in an underdeveloped region of a country, the gross subsidy may be determined by the extent to which the credit is used against taxable income.

\* \* \* \* \* \*

For purposes of determining the net subsidy, there is subtracted from the gross subsidy only the items specified in section [1677(6)]. The list is narrowly drawn and is all inclusive. For example, offsets under present law which are permitted for indirect taxes paid but not actually rebated, or for increased costs as a result of locating in an underdeveloped area, are not now permitted as offsets. In determining the amount of offsets which are permitted, it is expected that the administering authority will only offset amounts which are definitively established by reliable, verified evidence. [Emphasis supplied.]

S.Rep.No. 96–249 at 84–86, U.S.Code Cong. & Admin.News 1979, 470–472.

In analyzing the CCS program instituted by the Government of India, the ITA framed the issue as follows:

Can CCS payments to exporters of fasteners reasonably be considered non-excessive rebates of indirect taxes not otherwise rebated on export? If so, they are not subsidies within the meaning of the countervailing duty law; if not, they are subsidies.

The ITA thereupon construed the statutory provisions and legislative history thereto as requiring a three-prong test in determining whether export payments purportedly operating as a rebate of indirect taxes paid but not otherwise rebated are subsidies:

(1) whether the [export payment] operates for the purpose of rebating indirect taxes, (2) whether there is a clear link between eligibility for [export] payments and payment of indirect taxes, and (3) whether the government has reasonably calculated and documented the actual indirect tax incidence borne by exported fasteners and has demonstrated a clear link between such tax incidence and the amount of the [export payment].

In considering the weight to be given the Treasury Department's interpretation of the countervailing duty statutes then in effect, the United States Supreme Court stated in *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978):

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain [an agency's] application of [a] statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.'" [Citations omitted.]

Moreover, an administrative 'practice has peculiar weight when it involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' [Citations omitted.]

The question is thus whether, in light of the normal aids to statutory construction, the Department's interpretation is 'sufficiently reasonable' to be accepted by a reviewing court. [Brackets in original.]

This court concludes, based upon its examination of the Trade Agreements Act of 1979, the legislative history thereto, and the changes effected in the prior countervailing duty statutes by the 1979 Act, that the ITA's three-prong test consisting of three lines of inquiries, all of which must be answered in the affirmative in order to find that an export payment purportedly made as a rebate of an indirect tax not otherwise rebated is not a subsidy, is a "reasonable" interpretation of the requirements of the countervailing duty statutes.

The ITA determined that the CCS program had not satisfied the requirements for a non-excessive rebate of indirect taxes set out in its three-prong test:

Since the Government of India has not satisfactorily demonstrated the requisite linkage between the indirect tax incidence and the level of CCS payments, nor has shown that the actual indirect tax incidence has been reasonably calculated and documented, we have concluded that, in this case, the CCS payments must be considered a subsidy program and have found the amount of subsidy to be 17.5% of the f.o.b. value of the exported merchandise.

In order to demonstrate that the CCS payment is indeed a non-excessive rebate of indirect taxes, it must be shown that the level of said payment which the Government of India has decided to make to the fastener exporters reflected the calculation of the actual incidence of indirect taxes borne by the fastener exporters. It is apparent from its final determination that the ITA concluded that the proper time frame necessary to establish the requisite linkage between the indirect taxes paid but not otherwise rebated and the level of CCS payments must be that time at which the CCS payment rate of 17.5% of the f.o.b. value of the exported merchandise was set. The level of CCS payments made did not vary on a case by case basis depending upon the indirect tax incidence borne by each fastener exporter requesting a CCS payment. Rather, the fastener exporters were eligible and, accordingly, received the fixed lump-sum payment of 17.5% of the f.o.b. value of the exported merchandise which was made effective April 1, 1979, and was expected to continue in effect for three years. Where the administrative record is silent, as in the present proceeding, with respect to the efforts of the Government of India to review or reevaluate the CCS rate of 17.5% at any time after it had been originally established, the time frame utilized by the ITA in its effort to establish the requisite linkage between indirect taxes paid but not otherwise rebated and the level of the CCS payments was proper.

The ITA requested the Government of India for the "data" utilized, and the calculations made thereon, which resulted in the establishment of the CCS payment rate of 17.5%. The information apparently was never provided. AR. 23—Supplemental Countervailing Duty Questionnaire; AR. 435—Verification Report. The only factual information provided relating to the link between the calculation of the amount of the CCS rate established by the Ministry of Commerce and the amount calculated by the Ministry to be the actual indirect taxes paid but not otherwise rebated were certain documents submitted by counsel for the trade association (EEPC) to the Ministry, showing tax calculations of six industrial fastener firms and one industrial association, Fabricated Steel Structural Panel, which latter calculation provided aggregate data on the indirect tax burden of firms exporting anchor bolts. The indirect tax data so submitted shows a wide range of tax payments; 9.38%; 10.62%; 11.63%; 14.7%; 20.9%; 26.35% (percentages of the "f.o.b. realisation of the finished product"). AR. 444–49, 452–61.[3] Were it to have been assumed by the ITA that the calculation of the individual taxes paid but not otherwise rebated were based solely on the foregoing tax calculations, the absence of information as to the manner in which this data was treated by the Ministry would necessarily preclude a finding by the ITA that such taxes were reasonably calculated or that a clear link existed between the said taxes and the 17.5% rate established for the CCS payments.[4] It is worthy of note that the "proforma" submitted by the counsel for the EEPC in behalf of the respective individual companies and the industrial association, aforementioned, in fact affirmatively evidenced that exported fasteners satisfied other criteria compensable under the CCS program. It appears that some of the exported products were produced in the

---

**3.** On the face of it, there is no patent correlation between this data and the 17.5% CCS rate.

**4.** No evidence was submitted as to the weight given to the respective tax figures in the calculation of the actual indirect tax rate nor as to whether the Ministry did choose to rebate all of the indirect taxes included in the tax calculations.

"small scale sector" and to some degree production was "labour intensive." AR. 444–61. Counsel for the EEPC also admitted that the variance between the CCS rate for exports to the American continent and exports to other destinations, 17.5% and 12.5%, respectively, was due to the more stringent packing requirements for shipments to North America. In so doing, it is noted that counsel did not contend that the 5% differential was entirely due to indirect taxes placed on these additional packing requirements.

■ From a review of the record herein, it appearing:

(1) that the evidence clearly establishes that there may be criteria other than indirect taxes paid which are compensable by the CCS rate, and

(2) that the evidence fails to establish what portion of the 17.5% CCS payment has been allocated to compensate for indirect taxes paid as opposed to that portion allocated to compensate for other criteria, and

(3) that the evidence fails to establish the actual incidence of indirect taxes on which to base the CCS payments,

any determination by the ITA as to the extent the CCS payments represented a rebate of indirect taxes paid would be mere speculation. Where, as in the instant proceeding, the data necessary to establish a factual basis for the requisite linkage between indirect taxes paid and the established CCS payment rate is in control of those opposing the imposition of a countervailing duty, and, where information requested by the ITA has not been provided, it was not inappropriate for the ITA to impose a countervailing duty in the full amount of the export payment. *See ASG Industries, Inc. v. United States*, 610 F.2d 770, C.A.D. 1237 (1979).

■ The standard of review of a final determination made by the ITA is set forth in 19 U.S.C.A. § 1516a(b) which provides in relevant part:

(1) Remedy.—The court shall hold unlawful any determination, finding or conclusion found—. . .

(B) in an action brought under paragraph (2) of subsection (a) of this section, to be unsupported by substantial evidence on the record, or otherwise not in accordance with law.

In *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), the Court defined "substantial evidence" as

something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.

The determination by the ITA that a subsidy was paid to the exporters of industrial fasteners in the amount of 17.5% of the f.o.b. value of the exported merchandise, accordingly, is supported by substantial evidence and, accordingly, affirmed.[5]

■ Plaintiff also challenges as unsupported by the record or de minimis the determinations by the ITA that the GOI is providing subsidies in the form of packing credit loans and special income tax deductions for export market development in the amounts of 0.4% f.o.b. value and 0.1% f.o.b., respectively. In neither case, however, has the ITA presented this court with a sufficient basis on which to review the ITA's determination. It is necessary that the court be provided with the data utilized in the calculations by the ITA. The court does not sit as a finder of fact with respect to the administrative record presented to it for review. That is the role of the administrative agency. The court's role is to review the fact-finding done by the administrative agency and the legal conclusions reached by the agency's application of legal principles to those facts, and to determine whether

---

**5.** The foregoing basis of this court's affirmance of the ITA's determination renders it unnecessary to address the other contentions of plaintiff attacking the determination of the entire CCS payment as a subsidy.

those findings and legal conclusions are supported by substantial evidence and are in accordance with law. The failure of the ITA to provide the court with the basis of its determination precludes the court from fulfilling its statutory obligation on review. The court, accordingly, remands the within action to enable the ITA to provide a more explanatory basis on which the packing credit loan and the income tax deduction subsidies have been determined. Such additional information shall be submitted to the court within a period of thirty (30) days from the date of entry of this order.